**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**REDAN NORMAN,**                          **CASE NO. 2:06-cv-234**
                                                                    **JUDGE HOLSCHUH**
      **Petitioner,**                        **MAGISTRATE JUDGE KING**

**v.**

**ERNIE MOORE, Warden,**

      **Respondent.**

<u>**REPORT AND RECOMMENDATION**</u>

Petitioner, a state prisoner, brings the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254. This matter is before the Court on the instant petition, respondent's return of writ, petitioner's traverse and supplemental traverse, and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED** as barred by the one year statute of limitations under 28 U.S.C. §2244(d).

**I. FACTS and PROCEDURAL HISTORY**

The Ohio Tenth District Court of Appeals summarized the facts and procedural history of this case as follows:

> On May 14, 1998, appellant was indicted on one count of aggravated murder, alleging that appellant purposely killed the victim during the course of a kidnapping, one count of aggravated murder with prior calculation and design committed during the course of a kidnapping, and one count of kidnapping. Each count carried a firearm specification.
>
> A jury trial began on January 21, 1999. During the course of the proceedings, the second count was amended to reflect a charge of aggravated murder with prior calculation and design, without a capital specification. On January 28, 1999, the jury found appellant guilty of all counts and specifications. Appellant filed a motion for a new trial on February 5, 1999.

The mitigation phase of the capital trial began on February 10, 1999. On February 14, 1999, the jury recommended a sentence of life in prison with no possibility of parole, and the trial court sentenced appellant in accordance with the jury's recommendation. The trial court overruled appellant's motion for a new trial on March 15, 1999. Appellant filed a timely notice of appeal.

At trial, the prosecution presented evidence that, on May 3, 1998, the victim, Kaleb Williams, and Arlynda Heard visited appellant and his girlfriend, Amy Gill, at appellant's home. Heard testified that, earlier that day, she had met with Williams to talk about their son. Heard and Williams stopped at Innis Park to talk and then rode around for a while prior to arriving at appellant's house. Heard testified that appellant was a good friend of hers, "like my best friend." Heard testified that, when they got to the house, appellant and Gill were there. She stated that they introduced Kaleb to appellant and they were all "just sitting around drinking." (Tr. 32.)

At some point in the evening, Williams lost his temper with Heard, grabbed her by the neck and started choking her. After Williams let go, Heard asked appellant to ask Williams to stop choking her. Appellant intervened, and things returned to normal. About twenty minutes later, Donald Anderson, a friend of appellant's, knocked at the door. Heard answered the door and Anderson and Williams immediately exchanged words. According to Heard, appellant then went upstairs and came back downstairs with a gun. Heard testified that she and Williams were sitting on the couch and, when she saw the gun, she got up. She testified that appellant then pointed the gun and stated, "you see this, mother fucker" and then fired the gun. (Tr. 36.) Williams fell to his knees on the floor. Heard stated that Gill was in the kitchen at the time of the shooting.

About a minute later, appellant and Anderson picked up Williams and carried him outside to appellant's car which appellant had pulled around to the carport. As Anderson and appellant were carrying Williams out, Heard said she noticed that Williams's stomach was still moving, and that it appeared to her that he was still breathing and alive. After appellant and Anderson left with Williams in the trunk of the car, Gill began trying to clean up blood stains on the carpet, in the kitchen, and on the back patio. Heard telephoned her husband to come and pick her up, but remained in the house until appellant and Williams returned. As she left, she picked up a spent .22 shell casing and a live .22 round and took them with her.

Heard would not tell her husband what was wrong, although she was

2

crying. After Heard arrived home, she telephoned the police and told them that she had witnessed a murder.

On cross-examination, Heard testified that Williams had choked her hard enough to leave prints on her neck, her face turned red, and he cut-off her air supply. Heard also testified that, while Williams was lying on the floor, he never moved nor uttered a sound. Heard indicated that, prior to the shooting, Williams had been intoxicated and was angry and, particularly while he was choking Heard, he looked angry. Heard also stated that no one attempted to administer first aid, call 911, or check his pulse. After her husband arrived, they drove home separately. Heard indicated she had been home approximately an hour before she telephoned the police. Heard also stated that she told the police that she believed Williams was still alive when he was carried out of the house.

The state's next witness was William Lang, the first police officer on the scene. Lang identified the live round and shell casing that was turned over by Heard. Lang testified that, as he approached the house, he noticed some blood drippings on the patio and more drippings on the steps to the back porch. He also spotted a white Ford pulling away from the house with three occupants aboard.

The state's next witness was Mark Henson, a detective in the Crime Scene Search Unit, Columbus Division of Police. Henson identified a photograph log, a number of photographs, physical evidence that that was taken from the scene, and a white canvas tennis shoe, which had been recovered from a dumpster at the rear of appellant's home. The police also recovered a spring loaded feed tube used to load a .22 rifle. Henson identified a photograph that indicated a blood spot in the trunk of appellant's vehicle and also photographs showing blood smears on the rear of the vehicle.

Edward P. Breining, chief investigator with the Fairfield County Coroner's Office and a lieutenant with the Lancaster Fire Department, testified with respect to the victim's body, which was discovered at a remote location on Tussing Road. Breining testified that the victim was lying on his back in wet grass. There was some standing water around the body; one arm was over the victim's head. Breining noticed that one shoe was missing from the victim's body and that the victim had a white sock on. Breining detected no rigor mortis except for a small amount in a finger. He noticed a bloody foam-like material around the victim's mouth and nose. Breining testified that he had seen bloody foam, like the substance on the decedent's mouth,

3

numerous times in live people that have congestive heart failure. He indicated that when a person is having heart failure, serum is pushed to the lining of the lung and, as the person breaths, it creates foam that the person coughs up. Breining also indicated that he had seen foam on the body of a deceased person. Breining attended the autopsy but, at that time when he viewed the body, the foam was gone.

Keith Norman Norton, M.D., a forensic pathologist and deputy coroner for Franklin County, testified next. Dr. Norton testified that Williams, who was six feet one inches tall and one hundred ninety-nine pounds, suffered a single gunshot wound that entered the left side of his neck and exited the back right side of his neck. The bullet struck the cervical spine, bruising the spinal cord, causing paralysis, and resulting in a cessation of breathing. The bullet traveled in a slightly upward direction from left to right and front to back. The cause of death was asphyxiation due to bruising of the spinal cord.

The coroner testified that a person with the type of injury such as the victim would be likely to die as a result of that injury unless they got prompt medical care. According to the coroner, the victim would need someone (or something) to breath for them for a period of time, at least until the spinal cord got better. Moreover, a person would not be able to walk as a result of the bruising, but there might be a period of time as the bruising developed that would allow the person to live for a period of time. A person sustaining this type of gunshot wound would be effectively paralyzed from the neck down. Without prompt medical attention, death could occur immediately or up to thirty minutes later. Within the first five minutes of sustaining the wound, the victim still could have been breathing. The coroner also testified that Williams had a blood alcohol level of .22 grams percent, and a metabolite of cocaine was found in the victim's urine.

Dr. Norton explained that the white foam-like substance around the victim's mouth was the result of pulmonary edema. He testified that when the lungs are not getting enough oxygen into the blood or there is not enough oxygen getting into the lungs, the body responds by pushing fluid out into the lungs. The fluid mixes with the air in the lungs and makes bubbles. As more fluid is pushed into the lungs, air bubbles rise up and come out as foam. As the windpipe fills up and fills up through the mouth, the foam comes out through the mouth. The coroner was not able to determine the time between the gunshot wound and death by asphyxiation. He believed breathing probably stopped within thirty minutes of the gunshot wound, but that was just his best estimation.

4

Detective Ross W. Young, Jr., was the primary homicide detective in charge of the investigation. Prior to Detective Young arriving at appellant's home, he monitored a radio dispatch indicating that a white Ford Taurus had been stopped nearby. Appellant, Amy Gill, and Donald Anderson were inside the car.

Later, Detective Young interviewed appellant at police headquarters at approximately 5:00 a.m. According to Young, appellant described the conflict that had developed that evening between Williams and Heard. Young testified that appellant stated that he believed that Williams was shot in the shoulder and that he and Anderson drove the body from the scene of the shooting. Appellant claimed that the victim was conscious and that he mumbled something at one point. Appellant also stated to Detective Young that Williams sat up after they removed him from the car. The detective videotaped the discussion in the police station and, after appellant agreed to take the detective to the body, Detective Young recorded some further exchanges on a cassette recorder. The portion of the recording consisting of the conversation on the way to the body was played to the jury, but the trial court did not permit the second part of the tape containing the detective's impressions at the scene to be played for the jury.

Detective Young further testified that the body was found in a remote area near a water treatment plant. Detective Young noticed moisture about the face and a bubbling type of white foam or saliva coming out of his mouth and his nostrils. The victim's head was tilted towards his left and most of the foam seemed to be running out of the left side of his mouth. A medic called to the scene pronounced the victim dead at the scene. Detective Young also observed that the victim's extremities were cool to the touch and rigor mortis had not set in. The detective also testified that he put his hand toward the right side, close to the torso and armpit area, and that the victim still felt extremely warm in spite of the fact that he was lying in standing water. The outside temperature that morning was about fifty-two degrees. It had rained heavily the evening before.

On cross-examination, Detective Young admitted that none of his reports or recordings indicated that the body was extremely warm upon his arrival. The recording made at the scene further noted that the victim, who was missing a shoe, did not have a dirty sock. Detective Young surmised from this that it was unlikely that the victim moved from this position once he was placed there. The

5

detective also commented on the tape that there would have been more blood in the water had the victim still been alive.

Appellant testified on his own behalf. Appellant testified that he had worked on May 3 from 8:00 a.m. until 8:00 p.m. After he arrived home, he began barbecuing in the backyard. Arlynda Heard and Kaleb Williams arrived about twenty minutes after appellant arrived home. Heard introduced Williams to appellant. Appellant testified that he did not see what he described as the first confrontation between Heard and the victim. Appellant stated that his girlfriend, Gill, told him of the confrontation, and he went into the house to see what was going on. At that point, he observed Heard snatch the front door open and, just as she did, Donald Anderson was at the front door getting ready to knock. This startled Heard, and Anderson made a joking remark (apparently about Heard) to which Williams took offense. As Anderson attempted to shake hands with Williams, Williams pushed Anderson into the area by the television. Then, according to appellant, Williams began to choke Heard. Appellant saw Heard's face turn colors and she began vomiting. Appellant tried to explain to Williams that Anderson was not romantically involved with Heard, but Williams did not respond. Appellant began yelling at Williams to let her go, but Williams had a "scary look," "a look like there was nobody there." (Tr. 301.) At that point, appellant testified that he retrieved his .22 rifle from behind the sofa. Appellant testified that Williams was still choking Heard and that he noticed Williams's arms starting to flex even more. Appellant screamed at Williams to let her go, brought the gun up higher, and pulled the trigger. The gun went off. Appellant did not believe the gun was loaded, but the next thing he saw was the victim fall to the floor. Appellant dropped the rifle, and his girlfriend came running out of the kitchen. Appellant testified that his girlfriend became hysterical, and appellant's mind went blank and he panicked. Appellant testified that Heard was still trying to gasp for air as a result of the choking and that Anderson was present in the room during the shooting.

Appellant took the victim's pulse and was not able to find a pulse. Appellant testified the body remained at his house for approximately twenty-five to thirty minutes while everyone was in a panic. Appellant testified that he became scared and that he and Heard went out the front door, got in the car, and brought it to the back of the house. Appellant testified there was a lot of blood and that he and Anderson took the victim out of the house, placed him face up in the trunk of the car, and drove out to Tussing Road where they disposed of the body. Appellant stated that he threw the rifle into a creek.

6

After appellant and Anderson returned home, Heard and her husband were there, as well as appellant's girlfriend. Appellant checked on his girlfriend and decided to turn himself in to the police. Appellant went to his brother's house to talk to his brother prior to turning himself in. After he left his brother's house and was on his way home, the police picked him up at approximately 1:00 a.m.

Appellant testified that he had lied to the police about Williams being alive. Appellant testified that the police told him that if the body were still alive he would only be charged with felonious assault. Appellant admitted that it was not true that the victim sat up. Appellant explained his reason for giving a false statement was that, if Williams were still alive, appellant would only be charged with a lesser offense. Appellant stated that, after the gun went off, the victim never made any sound or movement whatsoever.

On cross-examination, appellant indicated that Heard and he were good friends, that he had known her for about three years, and that she looked to him as an older brother. Appellant indicated that Heard's version of the events differed in several respects from his. Appellant stated that Heard never came to him to tell him about the first choking incident. He further indicated that, after Anderson came into the house, Heard and Williams did not sit back down on the couch. Appellant stated that Heard was mistaken when she testified that appellant had run upstairs to get the gun and that she was further mistaken as to where appellant was located at the time of the shooting. Appellant indicated that he checked Williams's pulse in the neck area. Appellant indicated that he had only one drink that evening. He stated that the shooting was an accident and that he did not mean to kill Williams. When asked if he meant to pull the trigger, appellant responded "I tried to get him off of her." Appellant then testified that he intended to injure Williams but did not want to kill him. He insisted that he did not know that the gun was loaded. Appellant indicated that he pulled the trigger to scare Williams and that he pulled the trigger "to make it click." Later in his testimony, appellant indicated that he did not mean to hurt Williams at all, but that he just wanted to get Williams to stop choking Heard. Appellant testified that he was scared for himself and for Heard. Appellant stated that the victim was in a rage, and that is why he used deadly force. Appellant stated that he did not look at the victim's face and, thus, he did not observe any foam or blood coming out of the victim's nose or mouth.

7

Gill corroborated appellant's version of the facts in most respects. Gill indicated, however, that she was not present in the room at the time of the shooting but that, just seconds before the gun went off, she heard appellant plead with the victim to let Heard go. She testified that there was "lots and lots of blood" and that Williams never moved or made any sound after he fell. She believed he was dead. She observed appellant check for a pulse, and she watched while appellant and Anderson took Williams out of the house. After appellant and Anderson took Williams out, she began cleaning up the blood.

Exhibit 7 to Return of Writ. Represented by new counsel, petitioner filed a timely appeal. He asserted the following assignments of error:

FIRST ASSIGNMENT OF ERROR:

There was insufficient evidence to establish by proof beyond a reasonable doubt that Appellant purposely killed another during the course of a kidnapping.

SECOND ASSIGNMENT OF ERROR:

There was insufficient evidence to establish by proof beyond a reasonable doubt that Appellant committed the offense of kidnapping.

THIRD ASSIGNMENT OF ERROR:

There was insufficient evidence to establish that Appellant acted with prior calculation and design.

FOURTH ASSIGNMENT OF ERROR:

The jury erred in failing to find that defense of another was established by a preponderance of the evidence.

FIFTH ASSIGNMENT OF ERROR:

Appellant was denied his right to a fair trial as a result of prosecutorial misconduct.

SIXTH ASSIGNMENT OF ERROR:

8

The trial court erred in refusing to admit a taped statement made by Detective Young that was inconsistent with his in-court testimony and was the remaining portion of a tape that was played to the jury.

SEVENTH ASSIGNMENT OF ERROR:

The trial court erred in failing to instruct on the defense of accident.

EIGHTH ASSIGNMENT OF ERROR:

The trial court erred in giving confusing, incomplete, and inaccurate instructions on the charged offenses.

NINTH ASSIGNMENT OF ERROR:

The trial court erred in giving a confusing and inaccurate instruction on defense of another.

TENTH ASSIGNMENT OF ERROR:

Appellant was denied effective assistance of counsel as guaranteed under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

ELEVENTH ASSIGNMENT OF ERROR:

The trial court erred in excluding testimony at the mitigation hearing indicating that the co-defendant had been acquitted of identical charges.

TWELFTH ASSIGNMENT OF ERROR:

The trial court erred in failing to grant Appellant's motion for a new trial.

THIRTEENTH ASSIGNMENT OF ERROR:

Appellant's convictions were against the manifest weight of the evidence. This denied Appellant a fair trial and due process of law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

*Id.* On December 23, 1999, the appellate court affirmed the trial court's judgment. *Id.* Still

represented by counsel, petitioner filed a timely appeal. He asserted the following propositions of

9

law:

   1. It is improper for the State to use its authority to threaten to bring
   criminal charges against a defense witness to prevent that witness,
   through intimidation, from giving testimony.    Where the
   circumstances indicate that the prosecutor's motive was to prevent
   the defendant from presenting a full defense, this action constitutes
   misconduct and is grounds for reversal.

   2.  A defendant, whose conviction is not supported by sufficient
   credible evidence and is contrary to strong evidence of alibi, is
   deprived of due process of law as guaranteed under the Fifth and
   Fourteenth Amendments to the United States Constitution and Article
   I, Section 10 of the Ohio Constitution.

   3.  The exclusion of a taped statement of a witness' contemporaneous
   observations that is inconsistent with the witness' in-court testimony
   deprives a defendant of due process under the state and federal
   Constitutions.

   4.  When a portion of a recording is admitted at trial, a party may
   require the court to admit any remaining portion of the recording,
   which is otherwise admissible and which out in [sic] in fairness be
   considered.

   5.  An individual who acts in defense of another is justified in using
   deadly force to preserve the others' life, where he establishes by a
   preponderance of the evidence that the other is not at fault in creating
   the situation giving rise to the affray and he has a bona fide belief that
   another was in imminent danger of death or great bodily harm.

   6.  Evidence that a co-defendant had been acquitted on identical
   charges is admissible in a capital mitigation hearing as a factor that
   is "relevant to the issue of whether the offender should be sentenced
   to death."  R.C. 2929.04(B)(7).

   7.  A trial court abuses its discretion when it fails to order a new trial
   in light of strong evidence that the defendant was denied due process
   and a fair trial.

Exhibit 8 to Return of Writ.  On May 3, 2000, the Ohio Supreme Court denied leave to appeal and dismissed the appeal as not involving any substantial constitutional question.  Exhibit 10 to Return of Writ.

Meanwhile, on May 20, 1999, petitioner filed a *pro se* petition for post conviction relief.  He asserted the following claims:

> 1.  Prosecutorial misconduct.  *Brady* violation.
>
> 2.  Ineffective assistance of counsel.
>
> Counsel failed to obtain and use for purpose of impeachment, copy of investigator's report and interview of witness that would have shown that witness testimony was false.

Exhibit 11 to Return of Writ.  On September 7, 2000, petitioner filed a supplement to his post conviction petition in which he raised the following additional claims of ineffective assistance of counsel:

> 1.  Counsel failed to request an instruction on the defense of accident.
>
> 2.  Counsel failed to object to inadmissible evidence and argument from the prosecutor.

Exhibit 13 to Return of Writ.  On October 31, 2000, the trial court denied the post conviction petition as barred under the doctrine of *res judicata*.  Exhibit 15 to Return of Writ.[1]  Petitioner never filed an appeal of the trial court's decision; however, on April 24, 2000, he filed a *pro se* habeas corpus petition in the state trial court requesting a new trial based upon "new evidence" and because

---

[1]  The trial court's entry apparently erroneously refers to petitioner's post conviction petition as a motion for a new trial.  Exhibit 15 to Return of Writ.

Officer Robert Young's trial testimony was inconsistent with that of the coroner.  Exhibits 16, and

17 to Return of Writ.  Petitioner also filed, on August 20, 2001, a "Motion for Ineffective Assistance

of Counsel," in which he asserted that he was denied the effective assistance of counsel due to his

attorney's failure to call an expert witness to impeach the testimony of prosecution witnesses and

to show that the prosecutor had improperly withheld evidence.  Exhibit 19 to Return of Writ.  On

November 15, 2001, petitioner filed a motion for summary judgment.  Exhibit 22 to Return of Writ.

On August 27, 2003, the trial court dismissed petitioner's motion for ineffective assistance of

counsel and the petition for a writ of habeas corpus as not properly filed.  Exhibit 25 to Return of

Writ.[2]  Petitioner never filed a timely appeal of the trial court's decision.  On September 29, 2003,

he filed a motion for delayed appeal.  Exhibit 32 to Return of Writ.  On November 25, 2003, the

state appellate court denied petitioner's motion for delayed appeal.  Exhibit 34 to Return of Writ.

On December 23, 2003, petitioner's motion for reconsideration was denied.  Exhibits 35 and 38 to

Return of Writ.  Petitioner filed a timely appeal to the Ohio Supreme Court.  He raised the following

propositions of law:

> 1.  Court of appeals should not rule on a motion that was voided by
> the clerk of court and cost assessed to appellant.

> 2.  The court of appeals should not have denied appellant's notice of
> appeal that was timely filed.  Inmates have no control over the
> correctional facility mailing system.

---

[2]  On July 31, 2003, petitioner filed a petition for a writ of mandamus with the state
appellate court, requesting that the trial court be ordered to respond to his petition for a writ of
habeas corpus,  motion for ineffective assistance of counsel, and motion for summary judgment;
however, on October 31, 2003, the state appellate court dismissed the action.  Exhibits 30 and 31
to Return of Writ.

Exhibit 39 to Return of Writ.  On May 12, 2004, the Ohio Supreme Court declined jurisdiction to hear the case and dismissed the appeal.  Exhibit 41 to Return of Writ.

On October 2, 2000, and January 30, 2001, petitioner filed motions for a new trial on grounds of newly discovered evidence.  Exhibits 42 and 45 to Return of Writ.  The trial court denied both of petitioner's motions for a new trial on November 28, 2000, and February 14, 2001, respectively, as untimely and for failing to comply with local rules.  Exhibits 44 and 46 to Return of Writ.  Petitioner never filed any appeal.  On February 28, 2001, petitioner filed another motion for a new trial.  Exhibit 47 to Return of Writ.  On April 12, 2001, the trial court denied that motion. Exhibit 49 to Return of Writ.  Petitioner filed a timely appeal.  He asserted the following assignments of error:

> 1.  Appellant was denied his right to a fair trial as a result of prosecutorial misconduct.
>
> 2.  The lower court erred in failing to grant appellant's motion for a new trial.

Exhibit 50 to Return of Writ.[3]  On September 5, 2002, the appellate court affirmed the trial court's judgment dismissing petitioner's claims as barred under the doctrine of *res judicata*.  Exhibit 58 to Return of Writ.  On October 8, 2002, petitioner's motion for reconsideration was denied.  Exhibits 59 and 60 to Return of Writ.  Petitioner filed a timely appeal to the Ohio Supreme Court.  Exhibit 61 to Return of Writ.  On January 13, 2002, the Ohio Supreme Court declined jurisdiction to hear

---

[3]  On October 22, 2001, the state appellate court *sua sponte* dismissed the appeal due to petitioner's failure to file a proper brief.  Exhibit 52 to Return of Writ.  However, on December 5, 2001, the appellate court granted petitioner's motion for reconsideration and reinstated petitioner's appeal.  Exhibits 53 and 54 to Return of Writ.

the case and dismissed the appeal.  Exhibit 63 to Return of Writ.  On October 18, 2004, petitioner

filed yet another motion for a new trial in which he alleged that prosecution witness Arylnda Heard

lied at trial and subsequently recanted her trial testimony.  Exhibit 64 to Return of Writ.  On

November 8, 2004, the trial court denied petitioner's motion.  Exhibit 67 to Return of Writ.

Petitioner filed a timely appeal.  Exhibit 68 to Return of Writ.  On September 27, 2005, his appeal

was denied.  Exhibit 70 to Return of Writ.  On November 1, 2005, petitioner's motion for

reconsideration was denied.  Exhibit 73 to Return of Writ.  Again, petitioner filed a timely appeal

to the Ohio Supreme Court.  On February 8, 2006, the Ohio Supreme Court declined jurisdiction to

hear the case and dismissed the appeal as not involving any substantial constitutional question.

Exhibit 75 to Return of Writ.

On March 27, 2006, petitioner filed the instant *pro se* petition for a writ of habeas corpus

pursuant to 28 U.S.C. §2254.  He alleges that he is in the custody of the respondent in violation of

the Constitution of the United States based upon the following grounds:

> 1.  Insufficient evidence to establish proof beyond a reasonable doubt
> that petitioner committed the offense of kidnapping.

> 2.  Trial court erred in refusing to admit a taped statement made by
> Detective Robert Young that was inconsistent with his in-court
> testimony.

> 3.  The trial court erred in failing to grant petitioner's motion for a
> new trial.

> 4.  Motion for a new trial and evidence hearing.

It is the position of the respondent that this action must be dismissed as time-barred.

14

## II.  STATUTE OF LIMITATIONS

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which became effective on April 24, 1996, imposes a one-year statute of limitations on the filing of habeas corpus petitions.  28 U.S.C. §2244(d) provides:

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of--
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Here, petitioner's conviction became final on August 1, 2000, *i.e.,* ninety days after the Ohio Supreme Court's May 3, 2000, dismissal of his direct appeal, when the time period expired to file a petition for a writ of *certiorari* with the United States Supreme Court.  *See Bronaugh v. Ohio*, 235 F.3d 280, 283 (6th Cir. 2001).  Assuming that petitioner's May 20, 1999, post conviction petition

tolled the running of the statute of limitations under 28 U.S.C. §2244(d)(2) until November 30, 2000 (thirty days after the trial court's October 31, 2000, dismissal of the petition for post conviction relief, when the time period expired to file an appeal), the statute of limitations expired one year later, on November 30, 2001. *See Ali v. Tennessee Board of Pardon and Paroles,* 431 F.3d 896, 897 (6th Cir. 2005)*; Abela v. Martin*, 348 F.3d 164, 172 (6th Cir. 2003)(post conviction petition pending during the ninety day time period that petitioner could have filed a petition for a writ of *certiorari.*) None of the collateral state court proceedings initiated by petitioner tolled the running of the statute of limitations, as the record indicates that none of the foregoing actions were "properly filed" within the meaning of 28 U.S.C. §2244(d)(2).

> [A]n application is "*properly* filed" when its delivery and acceptance are in compliance with the applicable laws and rules governing filings. These usually prescribe, for example, the form of the document, the time limits upon its delivery, the court and office in which it must be lodged, and the requisite filing fee. See, *e.g., Habteselassie v. Novak,* 209 F.3d 1208, 1210-1211 (C.A.10 2000); 199 F.3d, at 121 (case below); *Villegas v. Johnson,* 184 F.3d 467, 469-470 (C.A.5 1999); *Lovasz v. Vaughn,* 134 F.3d 146, 148 (C.A.3 1998).

*Artuz v. Bennett,* 531 U.S. 4, 8 (2000)(footnote omitted). A post conviction petition dismissed by the Ohio courts as untimely does not toll the running of the statute of limitations under 28 U.S.C. §2244(d)(2). *Pace v. DiGuglielmo,* 544 U.S. 408, 417 (2005)*; Gorman v. Brunsman*, 2006 WL 1645066 (S.D. Ohio June 7, 2006).

Petitioner's April 24, 2000, petition for a writ of habeas corpus and his August 20, 2001, "Motion for Ineffective Assistance of Counsel," were denied by the state trial court as follows:

> It has come to the Court's attention that Defendant's "Motion for Ineffective Assistance of Counsel"... and his "Writ of Habeas

> Corpus"... filed in this case have not been ruled upon. It is the Court's conclusion that neither the "Motion" nor the "Writ" is properly filed in this criminal action.
>
> It is therefore ordered and adjudged that these filings be and they hereby are, dismissed.

Exhibit 25. The state appellate court subsequently denied petitioner's motion for delayed appeal noting:

> [A]ppellant's motion for ineffective assistance of counsel is not contemplated by the civil rules and is a nullity.

Exhibit 34 to Return of Writ. Similarly, the state trial court denied petitioner's October 2, 2000, and January 30, 2001, motions for a new trial as follows:

> The Defendant's motion is not timely filed pursuant to Crim.R. 33(B) and is hereby DENIED. Defendant's reasons for his delay, as submitted in a letter to this Court, does not show that he was unavoidably prevented from the discovery of the evidence proffered.

Exhibit 44 to Return of Writ.

> This cause came to be heard on Defendant's handwritten (second or third) motion for new trial.
>
> The motion does not comply with the local rules and is out of rule. The motion is DENIED.

Exhibit 46 to Return of Writ. The trial court denied petitioner's February 28, 2001, motion for a new trial without explanation. Exhibit 49 to Return of Writ. However, the state appellate court affirmed the trial court's decision, Exhibit 58 to Return of Writ, and denied petitioner's motion for reconsideration as follows:

> On September 13, 2002, defendant-appellant, Redan R. Norman, filed a motion pursuant to App.R. 26(A) seeking reconsideration of this court's September 5, 2002 Journal Entry overruling defendant's

17

assignments of error arising out of the trial court's judgment denying defendant's most recent motion for a new trial.

Defendant has filed at least three motions for new trial. The trial court overruled defendant's first motion because it was not timely under Crim.R. 33. Defendant filed a second motion for a new trial, and the trial court denied it for failure to comply with the local rules. Defendant filed a third motion for a new trial, and the trial court denied it without explanation. Defendant appealed from the third determination, and we concluded his appeal was barred by the doctrine of *res judicata* because he failed to appeal the trial court's ruling on defendant's second motion that raised the same issues he brought before the trial court in his third motion. Defendant contends in his motion for reconsideration that his third motion was an attempt to correct the trial court's reasons for denying his second motion.

Defendant is not permitted to file motions for new trial until he submits one that has an arguable issue. Crim.R. 33, under which defendant has filed his motions, has a time limit. Defendant has failed to comply with the time limits of Crim.R. 33. Accordingly, defendant's appeal of the trial court's April 12, 2001, judgment is without merit not only because of the doctrine of *res judicata*, but because defendant has failed to comply with Crim.R. 33. Defendant's motion for reconsideration is denied.

Exhibit 60 to Return of Writ. Likewise, petitioner's October 18, 2004, motion for a new trial was dismissed by the state courts as untimely. *See* Exhibits 67 and 70 to Return of Writ. Moreover, such action was filed long after the statute of limitations had already expired, and therefore does not toll the running of the statute of limitations. "The tolling provision does not ... 'revive' the limitations period (*i.e.*, restart the clock at zero); it can only serve to pause a clock that has not yet fully run." *Vroman v. Brigano*, 346 F.3d at 601, citing *Rashid v. Khulmann*, 991 F.Supp. 254, 259 (S.D.N.Y. 1998).

Therefore, the statute of limitations expired on November 30, 2001. Petitioner failed to execute the instant habeas corpus petition until March 18, 2006, more than four years later. Further, petitioner has failed to allege any extraordinary circumstances that would justify equitable tolling

of the statute of limitations for the time period at issue. *See Jurado v. Burt*, 337 F.3d 638, 643 (6th Cir. 2003).

Petitioner asserts that circumstances beyond his control prevented him from timely filing this federal habeas corpus petition, because the state trial court never notified him of the dismissal of his May 1999, petition for post conviction relief and indicated in its October 31, 2000, judgment entry of dismissal that it was denying a motion for new trial, rather than petitioner's post conviction petition. *See Reply to Respondent's Motion to Dismiss*, Doc. No. 21; Exhibit 15 to Return of Writ. Alternatively, petitioner contends that equitable tolling of the statute of limitations is appropriate because failure to review the merits of his claims will result in a fundamental miscarriage of justice, as the evidence was constitutionally insufficient to sustain his convictions, and due to various inconsistencies and alleged problems concerning the evidence against him. *See Reply to Respondent*, Doc. No. 20. Petitioner's arguments are not persuasive.

"[P]etitioner bears the ... burden of persuading the court that he or she is entitled to equitable tolling." *Griffin v. Rogers*, 308 F.3d 647, 653 (6th Cir. 2002). Equitable tolling should be used sparingly. *Cook v. Stegall*, 295 F.3d 517, 521 (6th Cir. 2002); *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 560 (6th Cir. 2000)(citations omitted). "Typically, equitable tolling applies only when a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control." *Id.* at 560-61.

> The Supreme Court has explained that "[w]e have allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." *Irwin v. Dep't of Veterans Affairs,* 498 U.S. 89, 96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990). However, "[w]e have generally been much less forgiving ⋯ where the claimant failed to exercise due diligence

19

in preserving his legal rights." *Id.; cf. Baldwin County Welcome Ctr. v. Brown,* 466 U.S. 147, 151, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984) ("One who fails to act diligently cannot invoke equitable principles to excuse that lack of diligence."). "Absent compelling equitable considerations, a court should not extend limitations by even a single day." *Graham-Humphreys,* 209 F.3d at 561.

*Jurado v. Burt, supra*, 337 F.3d at 642-43.  In order to determine whether equitable tolling is appropriate, the Court must consider the following five factors:

(1) the petitioner's lack of notice of the filing requirement; (2) the petitioner's lack of constructive knowledge of the filing requirement; (3) diligence in pursuing one's rights; (4) absence of prejudice to the respondent; and (5) the petitioner's reasonableness in remaining ignorant of the legal requirement for filing his claim.

*Id.*, at 643, citing *Dunlap v. United States*, 250 F.3d 1001, 1008; *Andrews v. Orr*, 851 F.2d 146, 151 (6th Cir. 1988).

Consideration of the foregoing fails to support a conclusion of equitable tolling.  There is no reason to conclude that petitioner lacked notice or constructive knowledge of the one-year filing requirement in habeas corpus cases, and petitioner would not have been reasonable in remaining ignorant of the statute of limitations in habeas corpus cases, which has been in effect since 1996. *See United States v. Baker*, 197 F.3d 211, 218 (6th Cir. 1999).  Further, the record fails to reflect that petitioner exercised diligence in pursuing his claims.  Assuming, *arguendo*, that petitioner remained unaware of the trial court's October 31, 2000, dismissal of his May 1999, petition for post conviction relief, petitioner nonetheless waited an additional six years before initiating federal habeas corpus proceedings.  Instead, petitioner filed various improper or untimely collateral actions in the state courts.  Finally, respondent certainly will suffer prejudice, if only in terms of time and expense, were this Court to equitably toll the statute of limitations in this case.

20

The Court notes that actual innocence may also justify equitable tolling of the statute of limitations.  *Souter v. Jones*, 395 F.3d 577, 602 (6th Cir. 2005).

> The United States Supreme Court has held that if a habeas petitioner "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims." *Schlup,* 513 U.S. at 316, 115 S.Ct. 851. Thus, the threshold inquiry is whether "new facts raise[ ] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial." *Id.* at 317, 115 S.Ct. 851. To establish actual innocence, "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."  *Id.* at 327, 115 S.Ct. 851. The Court has noted that "actual innocence means factual innocence, not mere legal insufficiency." *Bousley v. United States,* 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Schlup,* 513 U.S. at 324, 115 S.Ct. 851. The Court counseled however, that the actual innocence exception should "remain rare" and "only be applied in the 'extraordinary case.' " *Id.* at 321, 115 S.Ct. 851.

*Id*., at 590-91 [footnote omitted].  However, petitioner has failed to meet this standard here.

For all of the foregoing reasons, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED** as barred by the one-year statute of limitations under 28 U.S.C. §2244(d).

If any party objects to this *Report and Recommendation*, that party may, within ten (10) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a *de novo* determination of those portions of the

report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation*.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


January 26, 2007                                          *s/Norah McCann King*
                                                          Norah McCann King
                                                          United States Magistrate Judge

22